Commonwealth *v.* Grays, Appellant.

Argued November 8, 1954. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY, MUSMANNO and AR-NOLD, JJ.

*Harry R. Back,* for appellant.

*Victor Wright,* Assistant District Attorney, with him *Samuel Dash* and *Michael von Moschzisker,* First Assistant District Attorneys and *Richardson Dilworth,* District Attorney, for appellee.

OPINION BY MR. JUSTICE MUSMANNO, January 3, 1955:

On April 20, 1953, Charles "Pedro" Grays, the defendant in this case, Ernest Robinson and Julius Beverly alighted from a cab at 1529 West Seybert Street, Philadelphia, in front of which a car containing three men, was parked. Ernest Robinson was armed with a shotgun, Grays brandished a revolver. Advancing rapidly on the parked car, Grays fired his revolver at the left side of the vehicle while Robinson thrust the shotgun through a window and pulled the trigger, killing James Carroll sitting in the front seat.

Charles Grays pleaded guilty generally to murder. Three judges hearing the evidence adjudged him guilty of murder in the first degree and sentenced him to life imprisonment. This appeal followed.

The sorrowful state to which the value of human life sometimes falls in the history of the human race finds confirmation in this case. For no reason of magnitude, even in the meretricious and slippery code of criminals, the victim here was shot down with merciless flippancy as he sat unwarned of the murderous attack to be made upon him.

Charles Grays was a member of a bootleg gang engaged in the manufacture of illicit whiskey in a rented house at 2149 E. 8th Street in Philadelphia. When the landlord, learning of the lawless activities of his tenants, evicted them, the gang split into two factions: one made up of Charles Grays, Ernest Robinson and Julius Beverly; the other faction consisting of James Charleston and James Carroll. The sale of the distilling equipment and stocked whiskey brought into the hands of Beverly and Grays a certain amount of money which they did not divide with their partners in crime. Learning of this, Charleston and Carroll descended upon Grays and Beverly and by threats and show of armed force exacted from them approximately $400. When Robinson was informed of this extortion,

he set out, with Grays and Beverly, in quest of a shotgun.

They first called on a man identified in the record only as "Ike," and asked him for the desired weapon. Ike did not have a shotgun but he did have a revolver which he willingly turned over to the visiting hoodlums. They took the revolver but still sought out an arm with greater firing power. Their next stop was at the home of a T. Johnson, Robinson's brother-in-law. Johnson also expressed regrets for not having a shotgun lying around, but he was willing to pay to Robinson $45 of a debt he owed him, and perhaps this sum might help to get for them what they desired. Moreover, he would gladly join with them in the search for a suitable shotgun. Before participating in this hunt, however, he accepted Grays' invitation to help himself to whiskey which Grays had stocked up at his home. After taking a quantity of the contraband liquor, Johnson linked himself with his brother-in-law and they both took to the road to call upon their friends and acquaintances to obtain the ominous firearm which at suitably close range cannot miss its helpless target.

Robinson at last found a Vulcan Arms 12-gauge shotgun and returned to Grays' house with the coveted weapon in his grasp. The three of them (Robinson, Grays and Beverly) sat down for several rounds of whiskey, while they proudly displayed and inspected their recently acquired armory. Robinson announced the purpose of the gathering: "Well, we are going to get them." While manipulating the revolver it was discovered that this firearm was not in good working order. It jammed and presented other difficulties. They had better test it before embarking on their murderous errand. Robinson and Gray descended into the cellar for testing. Robinson's girl friend, Elizabeth Baity, testified at the trial that she heard the pistol

fired in the cellar, although she could not remember whether she heard one or two shots. Grays denied Baity's testimony that he had handled the revolver in the dining room, and equally denied that he had accompanied Robinson into the cellar for target practice. He placed the blame for this over-eagerness on Beverly. These denials, in the light of what followed, are quite irrelevant, even if they were to be accepted as established fact. . The stark reality is that when the three bootlegging knaves started out to accomplish their stupid and savage deed, Grays was the one who carried the revolver while Robinson took charge of the shotgun. Grays did try to get the shotgun for himself but Robinson would not release it to him.

While still in the house Robinson remarked that it was his idea to shoot Carroll in the leg. Grays commented that he only wanted to frighten him or "beat him up." Robinson was not satisfied with this treatment, significantly explaining that "they have hospitals for that."

Sordid, cheap and mean as was the purpose for which these potential assassins were planning to snuff out a human life, they had ample opportunity to reflect on the desperate seriousness of what they were contemplating. Three hours were yet to pass before they exploded their weapons in the culminating crime.

Even before they actually committed themselves to the execution of their witless and malignant plan, the prospective and unknowing victims (Charleston and Carroll), called on a man named Abe Cohen who apparently was a mutual friend of all members of this amoral outfit, to discuss with him the primitive enmity now raging between the two groups which had once been united in sturdy criminality. Cohen, in the guise of a peacemaker, notified the Grays group that

he would act as an intermediary. Grays called on Cohen to talk over possibilities in this connection.

While the conversation was in full course, Robinson arrived with the shotgun under his arm and informed Cohen: "We are going to kill him." He then turned to Grays and said: "We don't have time to talk. Let's go and kill him." Grays can never argue that Robinson spoke to him in a veiled or vague language. "Let's go and kill him" can only convey one meaning, namely, that Robinson was launched on an expedition of murder and he invited Grays to share with him the guilt of Cain. Grays did not refuse the invitation, he did not demur, he did not equivocate. Willingly and knowingly he joined up with Robinson to accomplish what the statutes of the Commonwealth and the law of the universe forbade—the taking of human life.

Gray's explanation at the trial that he did not know the revolver he carried was loaded can be rejected without any fear of doing him an injustice. Certain statements are so antagonistic to the setting in which they are imbedded that their falseness stands out like paste jewelry in a showcase of truth. The evidence is clear that Grays knew the revolver was loaded and it is even clearer that he knew the use to which the pistol was to be put to that night—in his own hand.

At 10 o'clock Robinson, Beverly and Grays boarded a cab and rode to the home of their intended victim. They arrived just as Carroll with Charleston and another man called James Laury pulled up to the Carroll house. Charleston was at the wheel, Laury sat next to him on the right, and Carroll occupied the place nearest the door on the right. Grays and Robinson leaped out of the cab and descended on the parked car, Grays aiming his revolver at the driver's side of the car, while Robinson circled around to the right and thrust the barrel of the shotgun into the window. Grays

fired two shots into the left side of the automobile, Robinson pulled the trigger of the shotgun on Carroll.

It is Grays' contention that since neither of the two bullets fired by him hit Carroll, he cannot be guilty of murder in the first degree. His counsel argues that a non-killer can be declared guilty of murder in the first degree only when his accomplice-killer destroys life in the perpetration of robbery, arson, rape, burglary or kidnapping, in accordance with the Act of 1939, June 24, P. L. 872, §701. Neither contention is sound in the law. The Act of 1939, June 24, P. L. 872, §1105, as amended by the Act of 1943, May 21, P. L. 306, §1; 18 PS §5105, provides, inter alia: "Every principal in the second degree or accessory before the fact, to any felony at the common law or under any act of Assembly may be indicted, tried, convicted, and if no punishment is provided, may be punished in all respects as if he were the principal felon." Since Grays in this case was obviously an accessory before the fact and a principal in the second degree, he "may be punished in all respects as if he were the principal felon."

The principle of law announced in the case of *Commonwealth v. Micuso*, 273 Pa. 474, 478, is applicable here: "Where two join in the commission of an unjustifiable assault, which results fatally, both are guilty regardless of which one inflicts the mortal wound . . ."

" 'Where two combine to commit a felony or make an assault, and in carrying out the common purpose another is killed, the one who enters into the combination but does not personally commit the wrongful act is equally responsible for the homicide with the one who directly causes it': 1 McClain on Criminal Law (ed. of 1897), p. 258, sec. 291."

The evidence in the case at hand goes much further than that in the *Micuso* case to hold Grays equally re-

sponsible with the man who actually killed Carroll. It was only because Robinson was a little more blood-thirstily accurate that the blast from his shotgun, instead of the bullets from Grays' revolver, ended the life of James Carroll. They were both present and engaged in the same planned action: the killing of their intended victim. They are both guilty of murder in the first degree and they are both lucky in that each sentencing tribunal imposed life imprisonment instead of the death sentence.

Judgment affirmed.

Mr. Justice JONES concurs in the result.